UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| -v.- | : |
| | S7 10 Cr. 336 (LAK) |
| JOHN CAMPOS, | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the United States
of America*

Arlo Devlin-Brown
Andrew D. Goldstein
Assistant United States Attorneys
    *- Of Counsel -*



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

June 20, 2012

**By Hand & ECF**
Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: <u>United States</u> v. <u>John Campos</u>, S7 10 Cr. 336
         Sentencing Submission

Dear Judge Kaplan:

  The Government writes with respect to the sentencing of John Campos, which is scheduled for June 27, 2012, and to address the defendant's sentencing submission of June 13, 2012. Both parties agree with the Probation Department that the adjusted Guidelines Offense level is 8 and the defendant's criminal history category is I, resulting in a Guidelines sentencing range of 0 to 6 months' imprisonment. The Government respectfully submits that a sentence within that range would be reasonable under 18 U.S.C. § 3553(a). As set forth below, while the defendant pled guilty to a misdemeanor offense and his Guidelines range is at the low end of the Guidelines, the defendant's offense – in which he used his leadership role at SunFirst Bank ("SunFirst") to cause the bank to participate in illegal gambling activities – was serious, and warrants a sentence that reflects such seriousness and will deter others from engaging in similar conduct.

**Offense Conduct**

  Campos was the Vice-Chairman of SunFirst, and a consultant to the bank. He was also a significant shareholder, having purchased 122,324 shares of SunFirst stock. PSR ¶¶ 36, 116. By the summer of 2009, Campos's only income came from SunFirst, which at that time faced the threat of closure by bank regulators because of its poor financial condition. PSR ¶ 36.

  In September 2009, a payment processor serving two of the remaining poker companies

1

doing business in the United States, Pokerstars and Full Tilt Poker, proposed to Campos an investment of $10 million in SunFirst in return for processing internet poker transactions. PSR ¶ 37. (The defendant contests whether the proposed investment was "in return for" SunFirst's agreement to process poker transactions. PSR at 33. Both documents and testimony indicate, however, that the investment and the poker processing were, at a minimum, strongly linked.)

The poker companies during this time period were having exceptional difficulty finding U.S. banks willing to process online gambling transactions because internet gambling businesses were illegal under U.S. law. PSR ¶ 24. As a result, the poker companies and their agents sought to identify small banks on the brink of failure – like SunFirst – and to offer such banks millions of dollars in investment in return for agreeing to process the poker transactions. As Campos considered the proposed investment, he reached out to SunFirst's attorney. PSR ¶ 37. While Campos asserts that he "has no recollection of the attorney advising him that processing poker would violate the law," Plea Tr. at 15, SunFirst's attorney has told the Government that he explicitly warned Campos that processing internet poker transactions would in fact violate the law. PSR ¶ 37 and p. 33. Indeed, in a September 29, 2009 e-mail (which Campos acknowledges receiving), SunFirst's attorney advised Campos that "[b]anks and bankers are not immune from prosecution" and that "proceeds from gambling in possession of the bank" could be "subject to seizure and forfeiture." *Id.* Campos responded by e-mail that the bank's lawyer was "up to his old tricks again, being a wet blanket" and proceeded to finalize the deal for SunFirst to process poker transactions. PSR ¶ 37.

In or about November 2009, SunFirst began processing payments for Pokerstars and Full Tilt Poker. PSR ¶ 38. Several members of the bank's board of directors have told the Government that they were not informed that the bank was processing poker transactions until well after such processing had begun. PSR ¶ 39. SunFirst ultimately processed over $200 million of payments for PokerStars and Full Tilt Poker through on or about November 9, 2010, when the FDIC issued an order directing the bank to immediately cease all third party payment processing. PSR ¶ 38. SunFirst earned approximately $1.6 million in fees for this processing, which was by far its largest source of income during that time period. *Id.* On or about November 3, 2011, bank regulators ordered the closure of SunFirst for lack of capital. *Id.*

**Discussion**

The Government takes issue with the defendant's characterization in his sentencing submission of certain facts relevant to the seriousness of his conduct. First, the defendant argues that he was "less wary" about processing poker transactions because, among other reasons, he had "strong support in the bank for the proposed processing of poker." Def. Submission at 20. This assertion is inconsistent with the record. As noted above, several members of the bank's board of directors have told the Government that the board was not informed of the poker processing until well after it had begun, and accordingly, the decision to process poker transactions was already made by the time it reached the board. The minutes of the meetings of the board of directors support these accounts of Campos's fellow board members, reflecting that

poker processing was not discussed at a board meeting until several months after the processing had begun. In addition, officers of the bank have told the Government that they, too, were not informed of the poker processing until after it had begun. And both board members and officers have told the Government that, upon learning of the processing, they objected to it and they voiced such objections to Campos and others.

      Second, Campos asserts that he "received virtually no personal financial gain as a result of his offense." Def. Submission at 21. While it is true that Campos received only $4,500 as a direct payment for poker processing, his financial interest in the bank was such that he stood to benefit enormously if the bank was able to process poker transactions without getting caught. As noted above, by the summer and fall of 2009, Campos's only income came from the bank, and he owned more than 120,000 shares of bank stock. The bank was facing insolvency at the time, and without a new revenue stream, Campos stood to lose his only source of income, as well as his considerable investment in the bank. Accordingly, Campos's assertion that he "did not engage in this conduct out of greed, but as part of a misguided attempt to help SunFirst survive the financial crisis," Def. Submission at 23, is at most a half-truth. While he may have been motivated in part by a misguided desire to help the bank, the evidence suggests that self-interest played a part too.

      Third, Campos suggests his culpability is lessened because he was supplied with "convincing legal opinions" professing to show that processing internet poker payments was legal. Def. Submission at 20. While the Government acknowledges that, had Campos chosen to go to trial, there was some litigation risk due to Campos's receipt of the poker company legal opinions, those opinions have little relevance to Campos's actual culpability. As set forth above, the Government has powerful evidence that SunFirst's lawyer explicitly warned Campos, both orally and by email, that processing internet poker transactions would violate the law, and could expose the bank to considerable legal and financial liability. Moreover, Campos admitted at his plea that he knew at the time his committed his offense that what he did was both wrong and unlawful. Plea Tr. at 16. Had the poker company legal opinions been truly persuasive, Campos would not have been able to make such an allocution.

      Finally, Campos argues that the seriousness of his offense is lessened because there was "no loss to any victim," including SunFirst itself. Def. Submission at 21-22. While that is true as a legal matter in applying the Guidelines in cases like this one, there is no question that Campos's conduct exposed the bank to considerable legal, regulatory and financial risk. Campos further claims that the Government "has conceded" that SunFirst was not harmed by Campos's offense because the poker processing temporarily sustained the bank and allowed it to defer regulatory seizure. *Id.* at 22 n.3. The Government has made no such concession. It is impossible to know what would have happened to SunFirst had Campos not caused the bank to start processing poker transactions – and it is certainly possible that SunFirst could have found another, legal, way to shore up its capital. Moreover, the fact that SunFirst was willing to process poker transactions enabled the poker companies to continue their business in the United

States for the approximately one-year period before SunFirst shut down the processing, with more than $200 million in poker transactions taking place during that time period.

     Accordingly, while the Government does not dispute that the applicable Guidelines range in this case is 0-6 months' imprisonment, the defendant's offense was serious, and his sentencing submission understates both his culpability and the potential effects caused by the offense.

          Respectfully submitted,

          PREET BHARARA
          United States Attorney

By:    /s/ Andrew D. Goldstein
        Andrew D. Goldstein
        Arlo Devlin-Brown
        Assistant United States Attorneys
        Tel. (212) 637-1559/2506